## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Cassandra S.,                                      Case No. 18-cv-1892 (ECW)

       Plaintiff,

    v.                                            **ORDER**

Andrew Saul,
Commissioner of Social Security,

       Defendant.

This matter is before the Court on Plaintiff Cassandra S.'s ("Plaintiff") Motion for

Summary Judgment (Dkt. 18) and Defendant Commissioner of Social Security Andrew

Saul's ("Defendant") Motion for Summary Judgment (Dkt. 21). Plaintiff filed this case

seeking judicial review of a final decision by Defendant denying her application for

disability insurance benefits and supplementary security income. For the reasons stated

below, Plaintiff's Motion is **DENIED**, and Defendant's Cross-Motion is **GRANTED**.

## I.      BACKGROUND

Plaintiff filed a Title II application for disability insurance benefits on August 27,

2015. (R. 232.)[1] Plaintiff also filed a Title XVI application for supplemental security

income on August 27, 2015. (*Id.*) In both applications, Plaintiff alleged disability

beginning January 1, 1997. (*Id.*) Plaintiff later amended her alleged disability onset date

from January 1, 1997, to November 11, 2014. (R. 10.) Plaintiff's applications for

---

[1]      The Social Security Administrative Record ("R.") is available at Dkt. 14.

disability insurance benefits and supplemental security income alleged disability due to adenocarcinoma stage 1, agoraphobia, manic depressive disorder, manic anxiety disorder, obsessive compulsive disorder, post-traumatic stress disorder ("PTSD"), pre cancer forming cells, psychosis, schizophrenia, and attention deficit hyperactivity disorder ("ADHD").  (R. 72-73.)  Her applications were denied initially (R. 151, 155) and on reconsideration (R. 163, 167).  Plaintiff requested a hearing before an administrative law judge ("ALJ"), which was held on September 7, 2017 before ALJ William L. Hogan.  (R. 7-25.)  The ALJ issued an unfavorable decision on October 31, 2017, finding that Plaintiff was not disabled from the alleged onset date through the date of the ALJ's decision.  (R. 25.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[2] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity since November 11, 2014.  (R. 12.)  At step two, the ALJ

---

[2]     The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

determined that Plaintiff had the following severe impairments: depressive disorder; ADHD; post-traumatic stress disorder; generalized anxiety disorder ("GAD"); personality disorder; and substance abuse. (R. 13.) The ALJ determined that Plaintiff had no severe medically determinable physical impairment, as her headaches improved with treatment, she was able to consciously control her seizure activity, and she was effectively treated for traumatic physical injuries and had normal subsequent physical examinations. (*Id.*)

At step three, the ALJ determined that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. (R. 14.) In making that finding, the ALJ considered whether the "paragraph B" criteria were satisfied and found that they were not, because Plaintiff's mental impairments did not cause at least two "marked" limitations or one "extreme limitation in any area of functioning. (*Id.*) The ALJ also considered whether "paragraph C" criteria were present and found that they were not, because there was no evidence that Plaintiff would have minimal capacity to adapt to changes in her environment or to demands that were not already a part of Plaintiff's daily life. (*Id.*)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following Residual Functional Capacity ("RFC"):

> [T]o perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can understand, remember, and carryout routine, simple, and repetitive three to four step instructions; can interact appropriately with supervisors on an occasional basis, meaning up to one-third of the workday; can have no interaction with coworkers or the public; can respond appropriately to changes in a work setting involving routine, simple, and repetitive three to four step tasks; and can make judgments on simple work-related decisions.

(R. 15.) In arriving at this RFC, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. (*Id.*)

On the basis of this RFC determination, the ALJ concluded that Plaintiff was able to perform past relevant work as an inspector and hand packager, Dictionary of Occupational Titles (DOT) #559.687-074 (light; unskilled, specific vocational preparation (SVP) level 2). (R. 22-23.) The ALJ found that Plaintiff had worked as an inspector and hand packager for two to three months; that this work was substantial gainful activity based on recorded earnings for that period; and that Plaintiff performed this work for a sufficient amount of time to learn the skills required to return to this work. (R. 23.) Accordingly, the ALJ found that Plaintiff's past work as an inspector and hand packager qualified as past relevant work. (*Id.*) Subsequently, the ALJ found that Plaintiff was able to perform the physical and mental demands of this past relevant work given her RFC. (*Id.*) As such, the ALJ concluded that Plaintiff was able to perform past relevant work. (*Id.*)

At step five of the sequential analysis, and based on the testimony of the vocational expert ("VE"), the ALJ made the alternative finding that in addition to her past relevant work, Plaintiff was capable of performing other jobs present in substantial numbers in the national economy, including laundry folder, DOT #369.367-018 (light; unskilled) with 20,000 jobs in the national economy; bench assembler, DOT #706.684-

4

042 (light; unskilled) with 60,000 jobs in the national economy; and small products assembler, DOT #706.684-022 (light; unskilled) with 75,000 jobs in the national economy. (R. 23-25.) The ALJ arrived at this determination after considering the Plaintiff's age, education, work experience, and RFC and the impact these attributes would have on Plaintiff's ability to make a successful adjustment to other work. (R. 23.) Accordingly, because Plaintiff was capable of performing both past relevant work and other jobs which existed in significant numbers in the national economy, the ALJ deemed Plaintiff not disabled. (R. 24.)

Based on the above determinations, the ALJ concluded that Plaintiff had not been under a disability from the alleged onset date of November 11, 2014, to the date of the ALJ's decisions, October 31, 2017. (R. 25.)

Plaintiff requested review of the ALJ's decision. (R. 229.) The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (R. 1-3.) Plaintiff then commenced this action for judicial review. The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by both parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.     RECORD

Plaintiff had been experiencing mental health issues since at least late 2014. On November 11 of that year—Plaintiff's alleged disability onset date—police brought Plaintiff to Benson Hospital's Emergency Department on reports of self-harm and

concerns about her personal safety.  (R. 456.)  Plaintiff had cut her arm with a kitchen knife after an argument with her fiancé.  (*Id*.)  The situation may have been exacerbated by Plaintiff's having missed several psychiatric appointments and run out of her prescribed medication.  (*Id*.)  Plaintiff reported being prescribed clonazepam, amphetamine-dextroamphetamine, and fluoxetine hydrochloride—in addition to other, non-psychiatric medications—at the time of the self-harm incident.  (R. 457.)  Hospital staff administered Klonopin and Prozac, dressed Plaintiff's cuts, and allowed Plaintiff to leave in the company of her fiancé after concluding that she did not represent a threat to herself or others.  (R. 459.)

Eight days later, on November 19, 2014, Plaintiff presented to ACMC-Willmar Clinic requesting refills of her psychiatric medications.  (R. 454.)  Plaintiff reported that she had not been able to see her psychiatrist to have her medications refilled.  (*Id*.)  A drug screen was negative for Plaintiff's prescribed Adderall but positive for methamphetamine.  (*Id*.)  Plaintiff's Prozac and clonazepam were renewed; her prescription for Adderall was not renewed pending scheduled appointments with her regular psychiatric providers.  (*Id*.)

Plaintiff returned to Benson Hospital's Emergency Department November 28, 2014, having sustained blows to the right side of her face and the left side of her body, as well as attempted choking, in a domestic altercation with her boyfriend/fiancé.  (R. 1033.)  Hospital staff noted "extreme emotional distress related to [the] physical and emotional assault," and Plaintiff was referred for counseling and allowed to rest in the hospital overnight.  (R. 431.)

On December 22, 2014, Plaintiff met with Ralph Johnson, LICSW, LMFT, at Woodland Centers in Willmar. (R. 632.) Plaintiff was alert and oriented, had good hygiene, was cooperative and had an appropriate affect, was sad and anxious, had normal speech, an estimated below average intelligence, and was distractible. (R. 633.) Therapist Ralph Johnson collected relevant medical and mental health histories and administered PHQ-9 and GAD-7 psychological tests—which rely on patient-reported symptoms—that resulted in findings of moderate anxiety and depression. (R. 634-35.) Therapist Ralph Johnson formed the diagnostic impression that Plaintiff suffered from Major Depressive Disorder and Personality Disorder. (R. 636.) As a result, he recommended that Plaintiff engage in individual therapy on a bi-weekly basis for three to six months. (*Id.*)

Plaintiff reported to Rice Memorial Hospital's Emergency Department on January 7, 2015. (R. 560.) Plaintiff presented with concerns about developing suicidal ideation after reportedly being cut off from her medication a week prior. (*Id.*) However, Plaintiff denied experiencing suicidal ideation on the day she reported to the hospital. (*Id.*) Plaintiff requested refills of her medications to bridge the gap until her January 26 psychiatric appointment at Woodland Centers. (*Id.*) Hospital staff administered a single 1mg dose of Ativan, an anti-anxiety medication. (R. 563.) Plaintiff became agitated when hospital staff would not refill her medications and asked to be let out for air. (*Id.*) Plaintiff was informed that this was against Emergency Department policy, and security staff were eventually required to address the situation. (*Id.*) Plaintiff was ultimately discharged to Woodland Crisis Center because of self-harm concerns. (*Id.*)

At Woodland Crisis Center, Andrew Johnson, LMFT, performed a crisis assessment on Plaintiff, also on January 7, 2015. (R. 638.) Plaintiff informed Therapist Andrew Johnson that she had been without her prescribed psychiatric medications for several weeks, after her previous prescriber had refused to continue treating her due to missed appointments. (*Id*.) Plaintiff denied currently experiencing suicidal ideations and admitted recently using methamphetamine. (*Id*.) Therapist Andrew Johnson observed Plaintiff's mental status to be sad and anxious, with impoverished thought content, below average intelligence, impaired attention and concentration, and poor insight and judgement. (R. 638-39.) Plaintiff claimed delusions in the form of her fiancé burning her with a cigarette and beating her up. (R. 639.) Therapist Andrew Johnson formed the diagnostic impression that Plaintiff suffered from Major Depressive Disorder and Personality Disorder. (*Id*.) He recommended admission to the crisis center and close observation. (*Id*.)

On January 9, 2015, two days after her admission to Woodland Crisis Center, Plaintiff met with Clinical Nurse Specialist Kristel Hart for a psychiatric diagnostic assessment. (R. 641.) Plaintiff reported recently experiencing various symptoms of depression including "decreased interests, energy, concentration, and appetite." (R. 642.) Plaintiff also reported physical, emotional, and sexual abuse by her father, paternal grandfather, and uncle from the ages of 2 to 10, which continued to cause her nightmares and flashbacks. (*Id*.) Plaintiff claimed hearing voices that would tell her to harm herself or others. (*Id*.) CNS Hart observed Plaintiff's mental status to be hyperfocused—particularly regarding being prescribed ADHD medication and clonazepam—with poor

insight, judgement, and motivation. (R. 645.) PHQ-9 and GAD-7 tests resulted in findings of moderate depression and severe anxiety. (R. 646.) CNS Hart formed the diagnostic impression that Plaintiff suffered from Major Depressive Disorder, Generalized Anxiety Disorder, Personality Disorder, and Client-Reported Seizure Disorder. (R. 647.) CNS Hart accordingly referred Plaintiff to the Woodland Crisis Center and Swift County for assistance with medications and housing. (*Id.*)

Plaintiff was subsequently informed on January 9, 2015, that she would not be able to leave Woodland Crisis Center to return home because she was unable to care for herself. (R. 565.) Plaintiff then began having a seizure-like shaking episode and was transferred to Rice Memorial Hospital. (*Id.*) At the hospital, Dr. Okerlund informed Plaintiff he would have to cut her sweatshirt, at which point she stopped shaking and said, "please don't cut my clothes." (*Id.*) Plaintiff was administered a single 1mg dose of Ativan and diagnosed by Dr. Okerlund as suffering from depression and anxiety. (R. 567, 569.) Plaintiff was anxious, her affect was angry and inappropriate, her speech was pressured, and her cognition and memory were impaired. (R. 568.) Hospital staff then returned Plaintiff to Woodland Crisis Center. (R. 569.)

On January 11, 2015, Plaintiff was again transported from Woodland Crisis Center to the Rice Memorial Hospital Emergency Department by EMS after a recurrence of her seizure-like spells. (R. 448.) EMS felt Plaintiff was having pseudoseizures and advised her to stop or they would have to drop in a nasal airway; Plaintiff then stopped shaking and started talking with EMS staff. (*Id.*) At Rice Memorial, Dr. Egal concluded that Plaintiff's symptoms were "consistent with psychogenic nonepileptic pseudoseizures."

(R. 574.)  Hospital staff administered a sodium chloride IV and diagnosed Plaintiff with a behavioral disorder.  (R. 450.)  Subsequently, Woodland Crisis Center refused to take Plaintiff back, stating she required care beyond what they could provide.  (*Id*.)

Over the next four weeks, Plaintiff missed several Swift County Adult Mental Health case management meetings.  (R. 1122-25.)  She also missed several psychiatric meetings at Woodland Centers with Nurse Practitioner Barbara Little ("NP Little"), and instead sought out a Primary Care Physician, Dr. Stephen Hietala, for a medication refill on February 16, 2015.  (R. 523.)  Dr. Hietala diagnosed Plaintiff as suffering from ADHD and a mixed Anxiety and Depressive Disorder.  (*Id*.)  He accordingly refilled Plaintiff's Klonopin, fluoxetine, and Adderall.  (*Id*.)  Plaintiff met with Dr. Hietala again on March 13, 2015 for another medication refill, stating at that time that she felt "her mood [wa]s doing fine," and that "she [wa]s doing well on the [medication] regimen."  (R. 521.)

Plaintiff eventually met with NP Little at Woodland Centers for a psychiatric diagnostic assessment on April 20, 2015.  (R. 653.)  At that time, Plaintiff reported experiencing severe anxiety, a recent suicide attempt, and a history of seizures, but denied recent illicit drug or alcohol use.  (R. 653, 1128.)  Plaintiff also informed NP Little that she was currently prescribed clonazepam and Adderall by a Primary Care Physician in Wadena but had no local provider.  (R. 653.)  Further, Plaintiff stated that she thought future suicide attempts were unlikely, but asserted that she would be "better off dead." (R. 1128.)  Plaintiff was oriented, had normal grooming, an appropriate affect, normal speech, an average intelligence, was distractible, and had a normal memory.  (R. 1132.)

NP Little observed Plaintiff's mental status to be dysphoric, anxious, and distractible, with poor insight. (R. 657.) NP Little formed the diagnostic impression that Plaintiff suffered from Major Depressive Disorder, ADHD, GAD, PTSD, and Histrionic Personality Disorder, and noted a client-reported Seizure Disorder. (R. 659.) NP Little also observed that Plaintiff had poor coping skills, minimal self-reliance skills, a history of severe abuse, and a tendency towards "histrionic responses to crisis situations," and reported that Plaintiff needed "help with community interaction and supportive services." (R. 1134-35.) NP Little further opined that Plaintiff had symptoms of mental illness that impaired her ability to secure or maintain employment. (R. 1135.) NP Little accordingly recommended continuing Plaintiff's medication with minor adjustments and referred Plaintiff to a neurologist for a consultation regarding her "seizure disorder." (R. 1135.)

Plaintiff was booked into Wadena County Jail on June 2, 2015 on fraud and forgery charges. (R. 432, 852.) After several days in jail, Plaintiff was transported to Tri-County Healthcare's Emergency Room in Wadena, after she had been "flailing on the floor" of the jail. (R. 439.) Hospital staff observed "[n]o evidence of seizure" and noted that the spells "appear[ed] to be a panic attack." (R. 442, 1140.) Plaintiff noted to jail staff that Geodon, an anti-psychotic drug, had been administered in the past for similar spells to beneficial effect. (R. 856.) Hospital staff administered Valium and discontinued Plaintiff's stimulant prescription because of her observed anxiety levels. (R. 1140.)

Later in the day on June 8, 2015, Nancy Bernstetter, LICSW, of Northern Pines Mental Health prepared an intervention report at the request of jail staff. (R. 432.) Plaintiff had been reporting auditory and visual hallucinations to jail staff, stating that

"[t]he demons are back. The voices are back." (*Id.*) Clinical Social Worker Bernstetter noted that Plaintiff's mental health was complex, given that she "knows what to say to get what she wants, which seems to be release from jail at this current time." (*Id.*) CSW Bernstetter also noted that Plaintiff "[t]alks clearly and logically at times, when she is trying to be convincing about her story." (*Id.*) Further, CSW Bernstetter observed that Plaintiff "lacks healthy, appropriate coping skills, [but] is able to get what she needs." (R. 433.) CSW Bernstetter recommended that Plaintiff remain incarcerated and finish her time. (*Id.*)

Plaintiff was again transported from Wadena County Jail to the TCHC Emergency Room on June 26, 2015 due to seizure-like activity. (R. 476.) An officer noted that Plaintiff was awake and talking, "shaking both arms and legs during the episode and complaining that she was having another seizure." (*Id.*) At the hospital, Dr. Faith opined that Plaintiff's episodes were "not consistent with seizure activity as she [wa]s able to talk and converse with generalized symptoms." (R. 478.) Dr. Faith further opined that he suspected the spells were psychogenic episodes and discharged Plaintiff back to jail. (*Id.*) Plaintiff was negative for hallucinations, confusion, self-injury and agitation. (R. 477.) Plaintiff was nervous, but she was not hyperactive. (*Id.*)

Plaintiff was once again brought to the TCHC Emergency Room from Wadena County Jail on June 30, 2015, again after experiencing "seizure type activity." (R. 470.) On this occasion, Plaintiff was observed to adapt her seizures to her surroundings, "mov[ing] her seizure over after an item was set near her." (R. 472.) Dr. Duchene opined that Plaintiff's movements were "likely behavioral," as Plaintiff was in jail. (*Id.*)

12

Plaintiff exhibited normal but slow speech, she was oriented, her cognition and memory were normal, and she exhibited a depressed mood. (*Id.*) Dr. Duchene accordingly did not administer benzodiazepines and instead encouraged Plaintiff to follow up with a psychiatrist, discharging her back to jail. (*Id.*)

On July 13, 2015, Plaintiff met with NP Little for a psychiatric medication management meeting at Woodland Centers. (R. 668.) NP Little observed Plaintiff's mental status to be generally normal but with poor judgment, fair to poor insight and fair to poor motivation. (R. 669.) NP Little affirmed her earlier diagnoses and continued Plaintiff's medications generally as prescribed but with an increase of Plaintiff's clonazepam dosage and the addition of an Ambien trial. (R. 670.) NP Little also instructed Plaintiff to continue attending individual therapy with her therapist. (*Id.*)

On August 2, 2015, Plaintiff was evaluated in Rice Memorial Hospital's Emergency Room due to increased visual and auditory hallucinations and recurrent headaches. (R. 486.) Dr. Scott observed Plaintiff's mental status to be generally normal outside of her self-reported hallucinations. (R. 487-88.) A drug test came back positive for methamphetamine which Plaintiff explained by noting she had been working cleaning out an old meth lab recently. (R. 486.) However, Plaintiff's boyfriend stated that she had been using meth the week prior and Dr. Scott noted that "Patient though has been labeled a 'liar' according to some old records as well." (R. 486, 493.) Plaintiff was alert and oriented, her memory was intact (except for a slightly diminished recent memory), her concentration was diminished, she had little difficulty with math, and her speech was normal with no flight of ideas noted. (R. 487-88.) Zyprexa proved helpful in

diminishing Plaintiff's hallucinations, and Dr. Scott eventually arrived at a final diagnosis of Major Depression, Recurrent Type, with a rule out diagnosis of Bipolar Disorder NOS with additional PTSD. (R. 487-89.) Plaintiff discharged from Rice Institute Inpatient care on August 11. (R. 499.)

Plaintiff was next in the Emergency Room on August 19, 2015, this time in Willmar, Minnesota. (R. 463.) Plaintiff reported to Emergency Room ER complaining of an acute right-sided headache, blurry vision, and sensitivity to light. (*Id.*) She requested Dilaudid, an opioid pain medication, stating that that was typically effective in controlling her headache. (R. 465.) A physical examination was normal. (*Id.*) Plaintiff did receive a 1mg dose of Dilaudid along with instructions to follow up with her physician if the headache worsened. (*Id.*)

Plaintiff was transported to Benson Hospital's Emergency Room via ambulance on August 23, 2015, having called emergency services after experiencing further seizure-like episodes. (R. 514.) EMS found Plaintiff's vitals to be normal but observed generalized shaking in both arms and to some extent both legs; they also found Plaintiff to be initially unresponsive. (*Id.*) Upon arrival at the ER, hospital staff observed further spells lasting 45-60 seconds and consisting mostly of "generalized shaking of the upper extremities, mainly of [plaintiff's] hands." (*Id.*) Plaintiff was, however, able to communicate effectively after each event. (R. 512.) Plaintiff was administered a total of 17mg of Valium as well as a loading dose of Dilantin, a seizure medication, to no effect. (*Id.*) Hospital staff noted that the spells "appeared to have no significant effect on her." (R. 907.) Dr. Richard Horecka told Plaintiff that "none of the characteristics of her

seizure activity was consistent with legitimate epilepsy," and that he believed the episodes "were being caused volitionally by herself," likely to get doses of drugs. (R. 512.) Plaintiff "had little to say after [Dr. Horecka] challenged her on the situation." (*Id.*) Dr. Horecka eventually arrived at a diagnosis of Pseudoseizures and Chronic Mental Illness, and Plaintiff was discharged the following morning. (R. 909.)

On September 14, 2015, Plaintiff met with Mental Health Practitioner Tiffany Miller at Woodland Centers for a Functional Assessment. (R. 650.) Plaintiff reported experiencing depression and anxiety on a regular basis along with a desire to die but no active suicidal ideation. (*Id.*) Plaintiff further reported being able to keep up with her required mental health treatment even when experiencing symptoms. (*Id.*) MHP Miller noted that Plaintiff's "symptoms impact her ability to seek and maintain employment, [to] seek housing, [and] to develop and maintain relationships." (*Id.*) MHP Miller also noted that Plaintiff had a history of drug-seeking behavior and that her "mental health symptoms and history leave [her] susceptible to drug abuse and inaccurate reporting regarding drug use and abuse." (*Id.*)

Plaintiff again reported to Rice Memorial Hospital's Emergency Room on September 28, 2015, complaining of migraine, vomiting, and nausea. (R. 742.) Plaintiff was at that time scheduled to see Dr. Nelson in one week for a neurological consultation related to her seizure-like spells. (*Id.*) Plaintiff was alert, she had a normal mood and affect and her behavior was normal. (R. 745.) Plaintiff was administered Dilaudid and Benadryl and instructed to continue taking Benadryl as needed for nausea and pain. (R. 745.)

Plaintiff returned to Rice Memorial Hospital's Emergency Room the following day, September 29, 2015, reporting auditory hallucinations commanding her to kill herself. (R. 594, 921.) Plaintiff reported experiencing similar hallucinations dating to the age of five and stated that she did not want to act on the commands, but that they became louder if she tried to ignore them. (*Id.*) Plaintiff was "begging for Geodon" to address the hallucinations and was administered 10mg of Geodon via intramuscular injection. (R. 609.)

That same day, Plaintiff also described actively experiencing severe depression, manic symptoms, anxiety, panic attacks, PTSD related to her childhood abuse, and dissociative episodes. (R. 594.) Dr. Scott observed Plaintiff's mental status to be generally normal outside of her self-reported hallucinations and anxious affect. (R. 595.) Dr. Scott also noted that Plaintiff "appear[ed] to try her best to talk physicians into more medicine than what she really needs," and that she "was already showing significant improvement at the time of discharge." (R. 596.) He arrived at a final diagnosis of Major Depression, Recurrent Type with the possibility of some Psychosis as well as Borderline Personality traits. (*Id.*) Plaintiff was held at the hospital on a 72-hour hold. (*Id.*)

Plaintiff met with NP Little on October 5, 2015 for a psychiatric medication management meeting. (R. 662.) NP Little noted that at that time Plaintiff's recent hallucinations were no longer occurring. (R. 663.) Plaintiff was alert, cooperative, exhibited normal thought content, her affect was appropriate, she had adequate hygiene, normal speech, was distractible, and her memory was intact. (R. 663.) NP Little

16

continued Plaintiff's medications including changes made by Dr. Scott at Rice Memorial. (R. 664.)

On October 6, 2015, Plaintiff failed to appear at her scheduled neurological consultation with Dr. Nelson. (R. 934.) The consultation was not rescheduled. (*Id.*)

Plaintiff once again reported to Rice Memorial Hospital's Emergency Room on October 11, 2015 with complaints of migraines. (R. 748.) Plaintiff was administered Dilaudid and Benadryl and discharged. (R. 751.) Her psychiatric examination was normal. (*Id.*)

Following Plaintiff's application for Title II and Title XVI social security benefits on August 27, 2015, NP Little prepared a Mental Medical Source Statement (MMSS) on October 27, 2015. (R. 674.) On that date, NP Little observed Plaintiff's mental status to be normal. (*Id.*) However, NP Little continued her previous diagnoses and added others, reporting Plaintiff's mental health conditions as Major Depressive Disorder, Attention Deficit Disorder, GAD, PTSD, and Histrionic Personality Disorder, and noting patient-reported seizures. (*Id.*) NP Little also opined that Plaintiff's "anxiety/panic prevent appropriate interaction in work, social, [and] public settings." (R. 675.)

NP Little further stated that Plaintiff possessed the following work-related abilities: moderate ability to express personal feelings; minimal ability to perform repetitive/short-cycled work, to perform a variety of duties, and to work alone/apart in physical isolation from others; and no ability to direct, control, or plan the activities of others, to influence people in their opinions, attitude, and judgements, to perform effectively under stress, to attain precise set limits, tolerances, and standards, to work

17

under specific instructions, to deal with people, to make judgements and decisions, or to exhibit reliability or consistency. (*Id.*) NP Little opined that Plaintiff would need unscheduled breaks during an eight-hour workday, would be likely to have good and bad days, and would be likely to miss three or more days per month. (R. 676.) Finally, NP Little stated that Plaintiff was clean and sober at the time the MMSS was prepared. (*Id.*)

Therapist Ralph Johnson similarly prepared a Mental Medical Source Statement, in his case on October 29, 2015. (R. 680.) He diagnosed Plaintiff as suffering from Major Depressive Disorder, ADHD, PTSD, Histrionic Personality Disorder, and panic attacks. (*Id.*) He opined that Plaintiff was not a malingerer, that she had extreme limitations in all work-related abilities, that she would need unscheduled breaks during an eight-hour workday, and that her limitations were likely to produce good and bad days. (R. 680-81.) Therapist Ralph Johnson further opined that Plaintiff was unable to keep a job because of her anxiety disorder and that she "cannot work period." (R. 682.) Finally, he stated that Plaintiff's impairments did not include alcohol or substance abuse. (R. 683.) Therapist Johnson provided no basis for his opinions.

Plaintiff met with MHP Tiffany Miller on October 30, 2015 for an individual living skills meeting. (R. 813.) Plaintiff informed MHP Miller that she felt she needed a higher level of care regarding her mental health, and that she would be going to Rice Hospital's Mental Health Unit for inpatient treatment. (*Id*.) That same day, Plaintiff again reported to Rice Memorial Hospital's Emergency Room complaining of migraines. (R. 689.) Plaintiff was administered Dilaudid and Benadryl and discharged with instructions to treat further headaches with rest and ice. (R. 691, 694.)

Plaintiff claimed to have attempted suicide on November 1, 2015. (R. 1235.) On November 3, 2015, Plaintiff was admitted to Rice Memorial Hospital's Emergency Room on reports of auditory hallucinations, suicidal ideation, and recent suicide attempts. (R. 760.) Plaintiff reported attempting to overdose on prescribed Geodon tablets the Sunday prior. (*Id.*) Plaintiff was initially placed on a 72-hour mental health hold and diagnosed with PTSD and Stimulant Use Disorder. (R. 763, 1204.) Plaintiff was subsequently transferred to Rice Institute Inpatient Treatment. (R. 1225.)

Plaintiff reported that she had experienced a pseudoseizure on November 4, 2015. (R. 935.) Plaintiff exhibited no post-seizure symptoms following the episodes, and various neurological tests all showed no deficits. (*Id*.) She stated she hurt the side of her head, however, staff found no indication of an injury. (*Id.*) The following day, November 5, 2015, Plaintiff met with Dr. Michael Walsh for a neurological consultation. (R. 944.) At that time, Plaintiff reported a history of seizures, worsened by anxiety, dating to when she suffered head trauma at the age of eight. (*Id*.)

Dr. Walsh concluded that Plaintiff's seizure activity the previous night was non-epileptic and was instead likely a fainting event. (R. 946.) Dr. Walsh further noted that Plaintiff's presentation was inconsistent with her subjective reports of depression and anxiety, and that Plaintiff was fixated on being prescribed Adderall, perseverating on that subject to the impediment of regular conversation. (R. 947.) Dr. Walsh eventually diagnosed Plaintiff with Substance-Induced Mood Disorder, Borderline Personality Disorder, malingering for controlled substances, and Pseudoseizures, and recommended a hold on Plaintiff's Adderall because of the risk of abuse. (R. 950-51.) The following

day, November 6, 2015, Plaintiff underwent an EEG administered by Dr. Walsh. (R. 943.) The results of the EEG were normal. (*Id.*) On November 12, 2015, Plaintiff underwent a brain MRI, the results of which were also normal. (R. 951-53.)

On November 6, 2015, Swift County Human Services filed a Petition to have Plaintiff civilly committed. (R. 1335.) On November 16, 2015, Swift County's Adult Protection Team discussed Plaintiff's case at a case consultation meeting. (R. 1224.) Case Worker Leanna Larson noted at that time that Plaintiff appeared to be "presenting with medical and/or mental health issues in an attempt to be prescribed pain or psychotropic medications." (*Id.*) A final commitment hearing was initially scheduled for November 20, 2015 but was postponed several times. (*Id.*)

In preparation for Plaintiff's final commitment hearing, Tim Tinius, Ph.D., prepared a psychological evaluation of Plaintiff at the request of Swift County. (R. 1225.) The evaluation incorporated the reports of staff from Plaintiff's time at Rice Institute Inpatient. (*Id.*) Plaintiff reported to Dr. Tinius that medication changes during her stay at Rice had been successful in controlling her hallucinations. (R. 1226.) Dr. Tinius observed Plaintiff to be in no distress until the subject of Plaintiff's Adderall prescription was raised, at which point she became irritable and fixated on resuming the medication. (R. 1228-30.) Dr. Tinius eventually diagnosed Plaintiff with Stimulant Use Disorder, Bipolar Disorder, malingering, Borderline Personality Disorder, and Polysubstance Abuse Disorder. (R. 1229.) Dr. Tinius opined that Plaintiff met the criterion for both mental illness (depression and hallucinations) and chemical dependency. (*Id.*) He concluded that Plaintiff "is in need of commitment for a period of

up to six months," and that outpatient treatment was likely to be ineffective as it would be impossible to gauge the effectiveness of and compliance with the treatment.  (R. 1229-30.)

Plaintiff's attorney requested a second psychological evaluation, which was performed by Phil Golding, Ph.D., L.P., on November 24, 2015.  (R. 1232.)  This evaluation also incorporated reports from Plaintiff's time at Rice Institute Inpatient Treatment.  (*Id*.)  Dr. Golding found that Plaintiff had "long-standing mental illness and chemical dependency problems that greatly impact[ed] her ability to function and live safely day-to-day."  (*Id.*)  Dr. Golding diagnosed Plaintiff with Schizoaffective Disorder, PTSD, Depressed Mood, Personality Disorder, and Chemical Dependence.  (*Id*.)  Dr. Golding concluded that Plaintiff "would benefit from a civil commitment [and met] the statutory definition as mentally ill."  (*Id.*)

Plaintiff's final commitment hearing was held December 2, 2015.  (R. 1260.)  Plaintiff was civilly committed.  (*Id*.)  Swift County Adult Mental Health opened a case the same day.  (R. 1333.)  Plaintiff was eventually transferred from Rice Memorial Hospital to the Willmar CARE inpatient treatment program on December 9, 2015.  (R. 762.)

On December 11, 2015, a chemical use assessment of Plaintiff was performed at Willmar CARE.  (R. 800.)  Plaintiff was diagnosed with Severe Opioid Related Disorder, Severe Sedative, Hypnotic, or Anxiolytic-Related Disorders, and Severe Tobacco Use Disorder.  (*Id*.)  The assessment's preparer opined that Plaintiff's "barriers include that she is disabled due to her mental health."  (R. 802.)  The preparer recommended complete

abstention from mood-altering chemicals and a 30-day hospital stay, dated from December 8.  (R. 800.)

On December 23, 2015, Plaintiff asserted that she heard voices, but claimed that her "mental health has been fine."  (R. 1271.)  On December 28, 2015, Swift County Adult Mental Health completed a Functional Assessment of Plaintiff.  (R. 1339.)  The assessment reported Plaintiff's eligible diagnoses as including Major Depressive Disorder, Recurrent; ADHD; GAD; PTSD; and Histrionic Personality Disorder.  (*Id.*) The assessment also identified Plaintiff's "Problems/Needs" as including mental health symptoms, mental health service needs, use of drugs/alcohol, vocational functioning, educational functioning, social functioning/use of leisure time, interpersonal functioning, self-care/independent living capacity, medical health, dental health, obtaining/maintaining housing, and legal.  (*Id.*)

According to Swift County internal memoranda, Plaintiff generally performed well in inpatient treatment over the next 1.5 months.  (R. 1260-80.)  Plaintiff was able to stop taking almost all controlled medications apart from Seroquel, which was used to treat her auditory and visual hallucinations.  (*Id.*)  Plaintiff also attended six individual therapy sessions with Therapist Ralph Johnson during this period, at which times he observed Plaintiff's mental status to be either dysphoric or anxious but generally normal. (R. 805-20.)  Plaintiff was eventually discharged from Willmar CARE to Life Right outpatient treatment in Alexandria on February 12, 2016, and staff reported that Plaintiff was doing "phenomenal" there one week later.  (R. 1282-83.)

However, Plaintiff missed an appointment at Woodland Centers on February 15, 2016. (R. 1296.) Two weeks later, Plaintiff visited a new Primary Care Physician and was re-prescribed Adderall. (R. 1293.) On March 10, 2016, Plaintiff missed another treatment appointment at Woodland Centers, (R. 1296), but staff at Life Right opined that Plaintiff was "still doing well for the most part" on March 25, 2016. (R. 1293.) Plaintiff had a client visit with Swift County Social Worker Leanna Larson that same day, March 25, at which time Plaintiff reported that she had "generally good mental health" and was in control of her auditory and visual hallucinations. (R. 1293-94.)

Plaintiff returned to Woodland Centers for a psychiatric medication management meeting with NP Little on March 28, 2016. (R. 828.) NP Little observed Plaintiff's mental status to be generally normal but with poor insight and judgement. (R. 830.) PHQ-9 and GAD-7 tests produced results of moderately severe depression and moderate anxiety. (R. 829.) NP Little continued Plaintiff's medications as previously ordered but informed Plaintiff that she would need to see her Primary Care Physician, Dr. Hietala, to continue her Seroquel and Adderall. (R. 830.) This was because the Seroquel was prescribed at a level that exceeded maximum FDA-recommended dosages, and because NP Little refused to prescribe Adderall due to Plaintiff's recent abuse of the drug. (*Id*.)

By March 29, 2016, Life Right staff were becoming concerned with what they perceived as Plaintiff's dishonesty, as well as with her recent missed appointments. (R. 1298.) The following month, on April 28, 2016, Plaintiff had a client visit with Social Worker Larson. (R. 1304.) Social Worker Larson reported that Plaintiff had been participating in group outings and activities and had even applied for a job at a nursery.

(R. 1305.)  Plaintiff also reported that she had been free of seizure-like episodes and had been managing her migraines without medication.  (R. 1306.)  However, on May 13, 2016, Plaintiff called Social Worker Larson upset that she had run out of Seroquel.  (R. 1311.)  She also informed Social Worker Larson that NP Little had refused to refill her Seroquel and Adderall because of their street value and addictive properties.  (R. 1312.)  Social Worker Larson and Plaintiff discussed Plaintiff's medication concerns, and Social Worker Larson followed up with Life Right staff.  (*Id.*)

On May 18, 2016, Social Worker Larson completed a final treatment report on Plaintiff for Swift County.  (R. 1344.)  The report concluded that commitment was no longer necessary.  (*Id.*)  On June 3, 2016, Plaintiff's civil commitment ended, (R. 1318), and on June 12, 2016, Plaintiff was discharged from Life Right.  (R. 1319.)

On July 23, 2016, Plaintiff again reported to Rice Memorial Hospital's Emergency Room complaining of migraines and requesting Dilaudid.  (R. 867.)  Hospital staff observed Plaintiff's mood, affect, and behavior to be normal.  (R. 870.)  Plaintiff was administered Dilaudid and Benadryl and discharged with instructions to see her regular doctor if the problem persisted.  (R. 869-71.)

On July 28, 2016, Social Worker Larson traveled to Plaintiff's home for a client visit.  (R. 1321.)  Social Worker Larson observed Plaintiff's apartment to be clean and well-organized.  (*Id*.)  At the meeting, Plaintiff claimed that she was sober and announced her intent to stop seeing NP Little for medication management but to continue seeing Therapist Johnson for individual therapy.  (R. 1322.)  Plaintiff also expressed interest in

participating in group activities and attending college. (*Id.*) Finally, Plaintiff reported experiencing one migraine and one "seizure"/fainting spell recently. (*Id.*)

On August 1, 2016, Swift County Adult Mental Health completed another Functional Assessment of Plaintiff. (R. 1347.) Plaintiff's eligible diagnoses were listed as Major Depressive Disorder, Recurrent, Unspecified; ADHD; GAD; PTSD; Major Depressive Disorder, Recurrent, Severe with Psychosis; Histrionic Personality Disorder; and Personality Disorder, not specified. (*Id.*) Vocational health was no longer listed as a problem/need. (*Id.*)

The next day, August 2, 2016, Plaintiff reported to Benson Hospital's Emergency Room requesting refills of her medications after being terminated by her prior psychiatrist, Dr. Arcilla. (R. 1072.) At Benson Hospital, Dr. Cameron diagnosed Plaintiff as experiencing an anxiety attack following an altercation between Plaintiff and her boyfriend. (R. 1073.) Dr. Cameron instructed Plaintiff to return the following morning because of concerns about dispensing Adderall and sleeping medications at the same time and ultimately instructed Plaintiff to follow up with her Primary Care Physician and a psychiatrist. (*Id.*)

On August 18, 2016, Psychiatric Nurse Natasha Fester ("NP Fester") at Woodland Centers prepared a Discharge Summary concerning Plaintiff's treatment at Woodland. (R. 850.) Plaintiff was instructed to return to her Primary Care Physician, Dr. Hietala, for medication management rather than return to seeing NP Little, because Plaintiff had obtained medications from Dr. Hietala, which NP Little declined to continue. (*Id.*) PN Fester reported that Plaintiff verbalized her understanding of the situation. (*Id.*)

Plaintiff again reported to Rice Memorial Hospital's Emergency Room on September 21, 2016, complaining of a migraine and requesting Dilaudid.  (R. 871.)  Plaintiff was administered Dilaudid and Benadryl.  (R. 874.)  She was then discharged with instructions to use rest and ice to treat further recurrences of migraines.  (R. 875.)

On October 10, 2016, Plaintiff missed a client visit with Social Worker Larson.  (R. 1327.)  At that time, Plaintiff had not had a client meeting with Social Worker Larson since July 28, 2016.  (R. 1323-27.)  On October 31, 2016, Social Worker Larson closed Plaintiff's case with Swift County Adult Mental Health Services.  (R. 1328, 1354.)

Plaintiff participated in a psychiatric diagnostic assessment with Dr. Eberly on October 19, 2016, at Woodland Centers.  (R. 836.)  Dr. Eberly observed Plaintiff's mental status to be dysphoric and anxious, with self-reported auditory and visual hallucinations.  (*Id.*)  Plaintiff was not taking any psychiatric medications since March 2016, but stated that Seroquel would help her with her mental health issues.  (*Id.*)  Dr. Eberly's examination showed that she had good grooming and hygiene, her thoughts were linear and coherent, her speech was normal, she was depressed/anxious, her affect was congruent, intellect was average, she had an intact memory, and good focus.  (R. 387.)  Dr. Eberly restarted Plaintiff's Seroquel prescription and instructed her to schedule a follow-up as soon as possible.  (*Id.*)

On October 24, 2016, Plaintiff reported to Appleton Municipal Hospital in Appleton, Minnesota, complaining of lower back pain and pelvic pain.  (R. 980.)  An initial physical exam was normal, and x-rays were requested.  (R. 980.)  She claimed not

to have seen a psychiatrist for several years.  (R. 980.)  Dr. Uptal Chakravorty refilled

Plaintiff's medications, including those for Seroquel and Adderall.  (R. 981.)

The next day, October 25, 2016, Plaintiff reported to Rice Memorial Hospital's

Emergency Room complaining of kidney stone pain and reporting that she had been

informed she had kidney stones when she was seen in Appleton "2 days ago."  (R. 876.)

Dr. Maryland administered Dilaudid, Ativan, Benadryl, and Soma.  (R. 882.)  CT scans

were all normal.  (R. 959-62.)

On November 1, 2016, Plaintiff underwent CT scans at Appleton Municipal

Hospital related to her complaints of kidney stone pain.  (R. 974-79.)  An abdominal CT

was normal.  (R. 974-75.)  Spinal and pelvic x-rays showed some calcifications.  (R. 976-

79.)  That same day, November 1, Plaintiff had a follow-up meeting with Dr.

Chakravorty.  (R. 982.)  Dr. Chakravorty reported that no organic causes for Plaintiff's

abdominal pain could be found and opined that it was likely "due to bad psychosomatic

experience in the past."  (*Id.*)  Dr. Chakravorty also declined to prescribe narcotic

medications for pain management given Plaintiff's "complex psychiatric regimen."  (*Id.*)

Plaintiff reported to Appleton Municipal Hospital on November 21, 2016,

complaining of a rash and requesting refills of Adderall, Paxil (an antidepressant),

Quetiapine (an antipsychotic), and Zolpidem (a sedative).  (R. 984.)  Dr. Chakravorty

refilled these medications. (R. 984-85.)  Plaintiff met with Dr. Chakravorty for a follow-

up on February 13, 2017.  (R. 990.)  Plaintiff's medications were again refilled, and a

low-dose clonazepam prescription was added.  (*Id.*)

Plaintiff again reported to Rice Memorial Hospital's Emergency Room on February 15, 2017, complaining of a migraine. (R. 891.) Plaintiff requested Dilaudid to treat the migraine. (*Id.*) Plaintiff was instead administered solely Benadryl. (R. 893.) Dr. Westburg noted past drug-seeking behavior. (R. 895.) Plaintiff became upset when she was not administered narcotics and left the Emergency Room before being discharged. (R. 894.)

Plaintiff was transported to Rice Memorial Hospital's Emergency Room via ambulance on February 28, 2017. (R. 1086.) The initial call was for an unresponsive person, but Plaintiff was initially communicative with EMS staff on the way to the ER. (*Id.*) Plaintiff then began to "exhibit seizure-like movements and was unresponsive" in the ambulance. (*Id.*) The movements momentarily stopped after Plaintiff was administered 2mg of Ativan (a benzodiazepine), and Plaintiff then began complaining of headache, dizziness, and blurred vision. (*Id.*) Seizure-like movements recurred, and Plaintiff was again administered 2mg of Ativan. (*Id.*) Plaintiff was also requesting pain medications throughout the interaction, but none were administered. (R. 1086-88.) Plaintiff claimed to have had a tumor removed from her head a day earlier in Montevideo. (*Id.*) A nerve block and acetaminophen were offered to treat the pain, but Plaintiff refused the treatment. (R. 1088.) Nurse Practitioner Shari Vanbriesen diagnosed the spells as pseudoseizures. (R. 1088.) Urinalysis was negative except for benzodiazepines, including negative results for medications on Plaintiff's self-supplied medications list. (R. 970-73, 1086-88.)

Over the next 43 days, Plaintiff would report to Appleton Memorial Hospital and Benson Rural Health Clinic for medication refills three times.  (R. 997, 999, 1003.)  On March 9, 2017, Plaintiff noted that she had been taking Paxil and clonazepam for her depression and anxiety and represented that these medications had been helping her treat the conditions and represented on April 11 that "her anxiety and depression **is under control on these medications**."  (R. 997, 999 (emphasis added).)  On the third occasion, Dr. Bajwa at Benson Rural Health Clinic was reluctant to refill Plaintiff's hydrocodone prescription, because Plaintiff had been prescribed the narcotic since December of 2016—a longer time than it would normally take for pain from a rib fracture to subside, in Dr. Bajwa's opinion.  (R. 1003.)  Dr. Bajwa referred Plaintiff back to Dr. Chakravorty for further medication refills.  (*Id.*)

During early 2017, Plaintiff was again seeing Therapist Ralph Johnson regularly for individual therapy.  (R. 841-45.)  On June 22, 2017, he authored an update letter stating that the opinions he expressed in his October 29, 2015 Mental Medical Source Statement had not changed.  (R. 827.)  However, the brief reports Therapist Ralph Johnson authored after each therapy session with Plaintiff during this time indicate that he observed her mental status to be anxious but otherwise generally normal.  (R. 841-45.)

On July 13, 2017, Registered Nurse Lori Deadrick at Woodland Centers filed Adult Mental Health Rehabilitative Services ("ARMHS") and Serious and Persistent Mental Illness ("SPMI") Statement Addenda concerning Plaintiff.  (R. 1381-82.)  In her ARMHS Statement Addendum, RN Deadrick opined that Plaintiff had symptoms of mental illness that impaired her psychiatric stability, access to mental health care,

maintenance of drug and alcohol abstinence, ability to secure or maintain employment or education, community integration, ability to obtain and maintain housing, ability to obtain and maintain financial assistance, and ability to use transportation. (R. 1381.) In her SPMI Statement Addendum, RN Deadrick opined that Plaintiff met the statutory definition of serious and persistent mental illness and that she was reasonably likely to have future episodes requiring inpatient or residential care unless ongoing case management or community support services were provided. (R. 1382.)

On July 25, 2017, Nikol Foss, the Women's Program Director at Life Right, issued a "To Whom It May Concern" letter regarding Plaintiff. (R. 1095.) Foss reported that Plaintiff was in the LifeRight Outreach program from February 12, 2016 to June 12, 2016, and that Plaintiff struggled with social and general anxiety during that period which was at times crippling. (*Id.*) However, Foss also stated that with time and medication Plaintiff acclimated to the program and was functional. (*Id.*)

### III.   LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), and whether the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "'Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions.'" *Id*. (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)). The Court "considers evidence that detracts from the

Commissioner's decision as well as evidence that supports it." *Id.* "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (citation omitted). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004). Moreover, assessing and resolving credibility is a matter properly within the purview of the ALJ. *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.")).

## IV. <u>DISCUSSION</u>

Plaintiff asserts that the Commissioner's determination of Plaintiff's RFC was erroneous and is not supported by substantial evidence. (Dkt. 19 at 25). Plaintiff's primary arguments in support of this assertion are that: (1) the limited weight given by the ALJ to the opinions of Nurse Practitioner Barbara Little and Therapist Ralph Johnson was improper; (2) the proper procedure for determining the materiality of Plaintiff's Drug and Alcohol Abuse was not followed; (3) improper weight was given to contrary opinions of record, particularly Plaintiff's consultative examination with Cathy Liane, M.S., in 2009 and the opinions of Social Security Agency sources; and (4) the RFC arrived at by the ALJ is not supported by substantial evidence. These contentions are discussed below.

**A.      The Weight Assigned to NP Little and Therapist Johnson's Opinions**

Plaintiff contends that the ALJ improperly rejected the opinions of NP Little and

Therapist Ralph Johnson when conducting the RFC analysis.  (Dkt. 19 at 4.)  Because

Plaintiff makes similar arguments with respect to the opinions of NP Little and Therapist

Ralph Johnson, these arguments will be discussed together.

At the outset, it should be noted that the ALJ did not reject the opinions of Little

and Johnson outright, as Plaintiff sometimes contends in her brief.  (*See id*.)  Instead, the

ALJ assigned "little weight" to the opinions of Little and Johnson in evaluating Plaintiff's

RFC. About Little's opinions, the ALJ stated:

> These opinions are given little weight because a nurse practitioner is not an
> acceptable medical source and the opinions are not consistent with the
> medical evidence of record showing the claimant had mostly normal mental
> status examinations around the time the opinions were made.  Additionally,
> there is no indication that they took into account the claimant's substance
> abuse, drug seeking behavior, and history of inconsistent statements to
> medical providers.

(R. 19.)

The ALJ's statements concerning Johnson's opinions were identical.  (*See id*.)

This Court must thus analyze whether the ALJ's decision to assign "little weight" to the

opinions of Little and Johnson was an error of law.  *Nash*, 907 F.3d at 1089.  After

completing a careful review of the record, the Court concludes that the ALJ gave

appropriate weight to the opinions of Little and Johnson, for the reasons discussed below.

First, Plaintiff contends that the ALJ's assignment of "little weight" to the

opinions of Little and Johnson was erroneous because they had long-term, treating

relationships with Plaintiff.  (R. 11-12.)  Plaintiff correctly points out that pursuant to 20

C.F.R. § 404.1527(c), every medical opinion a claimant provides will be evaluated in assessing a claim for Social Security benefits. (*See* Dkt. 19 at 12.) Plaintiff is also correct that the weight each opinion is granted will depend on the nature of the examining relationship between the claimant and the source providing the opinion; the length, nature, and extent of the treatment relationship between the claimant and the source; the extent to which the source presents medical evidence to support the opinion; the consistency of the opinion with the record as a whole; the specialization of the source providing the opinion; and other relevant factors. 20 C.F.R. § 404.1527(c). (*See* Dkt. 19 at 12.) Finally, Plaintiff correctly observes that 20 C.F.R. § 404.1527(c) provide that medical opinions from sources who have lengthier relationships with a claimant or who have treating relationships with the claimant will generally be given greater weight than those from providers who do not. (*See* Dkt. 19 at 12.)

However, the relevant factors to be considered in determining the weight assigned an opinion from a source other than an "acceptable medical source" "depend[] on the particular facts in each case." 20 C.F.R. § 404.1527(f)(1). Neither NP Little nor Therapist Ralph Johnson is an acceptable medical source under the Social Security regulations in place at the time Plaintiff applied for benefits. *See* 20 C.F.R. §§ 404.1502(a), 404.1527(a); SSR 06–03p, 71 Fed. Reg. 45,593 (Aug. 9, 2006) (defining "acceptable medical sources" as licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists). The ALJ's assignment of "little weight" to the opinions of NP Little and Therapist Ralph Johnson was thus not erroneous simply because they had relatively lengthy treating

relationships with Plaintiff and are mental health specialists. *See* 20 C.F.R. §

404.1527(c)(1)-(6); SSR 06-03P, 2006 WL 2329939, at *5.

Plaintiff next contends that the ALJ's decision to assign "little weight" to the

opinions of NP Little and Therapist Ralph Johnson was erroneous because these opinions

were consistent with each other and with other evidence in the record. As noted, neither

NP Little nor Therapist Ralph Johnson is an "acceptable medical source" under the Social

Security regulations in place at the time Plaintiff applied for benefits. *See* 20 C.F.R. §§

404.1502(a), 404.1527(a); SSR 06–03p, 71 Fed. Reg. 45,593 (Aug. 9, 2006). Instead,

both are "other sources." SSR 06–03p, 71 Fed. Reg. 45,593.

That said, opinions from "other sources" are still to be evaluated under the criteria

provided in 20 C.F.R. § 404.1527(c), including, the length and frequency of treatment,

the nature and extent of the treatment relationship, consistency of the opinion,

supportability of the opinion, and the specialization of the provider. 20 C.F.R. §

404.1527(f); *see also Dols v. Saul*, No. 18-1910, --- F.3d ---- 2019 WL 3366655, at *8

(8th Cir. July 26, 2019) (citing 20 C.F.R. § 404.1527(c), (f)(1)); SSR 06-03P, 2006 WL

2329939, at *3-5. Further, "[t]he evaluation of an opinion from a medical source who is

not an 'acceptable medical source' depends on the particular facts in each case. Each

case must be adjudicated on its own merits based on a consideration of the probative

value of the opinions and a weighing of all the evidence in that particular case." SSR 06-

03P, 2006 WL 2329939, at *5. However, while "[e]vidence provided by 'other sources'

must be considered by the ALJ . . . the ALJ is permitted to discount such evidence if it is

inconsistent with the evidence in the record." *Lawson v. Colvin*, 807 F.3d 962, 967 (8th

Cir. 2015) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 886-87 (8th Cir. 2006); *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005)). Moreover, a treating provider's "own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)).

Here, the ALJ assigned "little weight" to the opinions of Little and Johnson in part because he observed their opinions to be "not consistent with the medical evidence of record," including their own observations of Plaintiff's mental status. (R. 19.) Plaintiff contends that, because both NP Little and Therapist Ralph Johnson's opinions were consistent with each other and with other pieces of evidence in the record, the ALJ's determination that they were inconsistent with the record was necessarily erroneous. (*See* Dkt. No. 19 at 14-19.) However, the fact that NP Little's and Therapist Ralph Johnson's opinions were not wholly inconsistent with every piece of evidence in the record does not mean that they were consistent with the record as a whole. Instead, to be "inconsistent with the evidence in the record," the opinion of an "other source" need only be inconsistent with "the totality of the medical evidence." *See Lawson*, 807 F.3d at 967.

On review, the totality of the medical evidence is inconsistent with NP Little's and Therapist Ralph Johnson's opinions. NP Little's reported observations of Plaintiff's mostly normal mental status, made at or near the time when she prepared her Mental Medical Sources Statement (MMSS), are inconsistent with the opinions set forth in that statement. (*See e.g.*, R. 595, 663, 669, 674, 811-12.) The same is true of Therapist Ralph Johnson's reported observations of Plaintiff's mostly normal mental status made at or

near the times he prepared his MMSS and the update to it.  (*See e.g.,* R. 807, 841-45, 1185, 1186.)  Furthermore, the opinions contained in their MMSSs are contradicted by the evidence in the record as a whole, including contemporaneous observations of Plaintiff's mental status, the fact that her depression and anxiety were controlled by medications, her communicative abilities, and her drug-seeking behavior.  (*See, e.g.*, R. 432-33, 487-88, 595, 997, 999.)  The ALJ's determination that NP Little's and Therapist Ralph Johnson's opinions were "not consistent with the medical evidence of record" is thus not clearly erroneous, and the ALJ's decision to assign "little weight" to their opinions was not legal error merely because those opinions did not conflict with every piece of evidence in the record.[3]  *See Lawson*, 807 F.3d at 967.

Finally, Plaintiff points out that the ALJ observed that "there is no indication that [NP Little and Therapist Ralph Johnson] took into account the claimant's substance abuse, drug-seeking behavior, and history of inconsistent statements" in forming their opinions.  (Dkt. 19 at 19.)  Plaintiff seems to contend that granting "little weight" to NP Little's and Therapist Ralph Johnson's opinions for this reason was erroneous, because Plaintiff was in fact clean and sober around the time they authored their Mental Medical Source Statements.  (*Id*. at 20.)

---

[3]    Plaintiff also points to her December 2, 2015 civil commitment as evidence supporting the mental limitations put in place by her treating providers.  (Dkt. 19 at 16.)  However, as part of the commitment Plaintiff was precluded access to addictive substances, which she responded well to, and got the point that she finished with the mental health aspect of the civil commitment by December 9, 2015, with the remainder of the commitment focusing on her chemical dependency.  (R. 760-62.)

However, there is evidence in the record calling Plaintiff's sobriety at the time into question. (*See* R. 486, 493.) Additionally, other service providers—for example, Mental Health Practitioner Tiffany Miller of Woodland Centers—cited Plaintiff's past substance abuse, drug-seeking behavior, and history of inconsistent statements in evaluating Plaintiff's mental health at roughly the same time that NP Little and Therapist Ralph Johnson authored their Mental Medical Sources Statements. (*See, e.g.,* R. 650.) In any event, because both NP Little and Therapist Ralph Johnson opined that Plaintiff was clean and sober at the time they prepared their Mental Medical Source Statements— without any indication that urinalysis or other testing supported that conclusion (*see* R. 674-76, 680-83)—it was not legal error for the ALJ to consider NP Little and Therapist Ralph Johnson's omission of Plaintiff's past substance abuse, drug-seeking behavior, and history of inconsistent statements as "other factors . . . which tend to . . . contradict" their medical opinions. 20 C.F.R. § 404.1527(c).

In sum, it was not legal error for the ALJ to grant "little weight" to the opinions of NP Little and Therapist Ralph Johnson. The ALJ's assignment of "little weight" to those opinions was not erroneous merely because NP Little and Therapist Ralph Johnson had relatively lengthy treating relationships with Plaintiff or because they were mental health specialists. *See* 20 C.F.R. § 404.1527(f)(1). Additionally, an ALJ is permitted to discount evidence provided by "other sources" such as NP Little and Therapist Ralph Johnson if it is inconsistent with the evidence in the record. *Lawson*, 807 F.3d at 967. The ALJ here found that to be the case, and a thorough review of the record as a whole supports that conclusion. Finally, NP Little's and Therapist Ralph Johnson's conclusory

statements that Plaintiff was clean and sober at the time they authored their MMSSs, and their failure to consider Plaintiff's past substance abuse, drug-seeking behavior, and history of inconsistent statements, were factors which tended to contradict their medical opinions. The ALJ was thus justified in considering NP Little's and Therapist Ralph Johnson's failure to consider such factors when deciding how much weight to assign to their opinions. *See* 20 C.F.R. § 404.1527(c). Accordingly, after a careful review of the record the Court concludes that the ALJ's assigned weight to the opinions of NP Little and Therapist Ralph Johnson is supported by substantial evidence.

**B.     Drug Use**

Plaintiff also argues that the ALJ improperly rejected her claim because he found that her disability was caused by substance abuse and drug-seeking behavior. (Dkt. 19 at 20-22.) Specifically, Plaintiff contends that the ALJ improperly determined that Plaintiff was not disabled because her drug or alcohol abuse ("DAA") was material to her alleged disability, instead of following the six-step process set forth in SSR 13-2p for determining the materiality of a claimant's DAA. (Dkt. 19 at 21.) The Court concludes that the ALJ did not err in his analysis of Plaintiff's DAA, for the reasons discussed below.

The materiality of a Social Security claimant's DAA need only be considered once a claimant is deemed disabled. SSR 13-2p ("Under the Act and our regulations, we make a DAA materiality determination only when [w]e have medical evidence from an acceptable medical source establishing that a claimant has a Substance Use Disorder, *and* **[w]e find that the claimant is disabled** considering all impairments, including the

DAA.") (emphasis added). Here, the ALJ determined that Plaintiff was not disabled even when considering the extent and severity of her substance abuse. (R. 25.) The ALJ's consideration of Plaintiff's DAA is evidenced by the ALJ's references to Plaintiff's positive urinalysis, drug-seeking behavior, and admitted use of methamphetamine in the text of his decision (*see* R. 7-33), as well as his finding that substance abuse was a severe limitation in Plaintiff's case (R. 13). Because the ALJ determined that Plaintiff was not disabled even when considering her DAA, he was not required to inquire into the materiality of Plaintiff's DAA or to employ the six-part test set forth in SSR 13-2p. *See* SSR 13-2P. Accordingly, the Court concludes that the ALJ did not err in his analysis of Plaintiff's DAA.

**C.      The Weight Given to Contrary Opinions of Record**

Plaintiff also contends that the ALJ gave improper weight to "contrary opinions of record" in concluding that Plaintiff was not disabled. (R. 23.) In particular, Plaintiff argues that the ALJ improperly assigned "great weight" to the opinions of Cathy Liane, L.P., who performed a Mental Status Examination of Plaintiff in 2009, and to the opinions of "nonexamining, non-treating State agency reviewers." (Dkt. 19 at 23.)

Plaintiff underwent a Mental Status Examination with Liane on December 1, 2009. (R. 417.) Liane diagnosed Plaintiff with bipolar disorder, PTSD, and nicotine dependence. (*Id.*) Liane observed Plaintiff's mental status at the time of the examination to be generally normal. (*See* R. 416-17.) Liane further observed that Plaintiff had the ability to perform self-care tasks, household chores, and other activities of daily life. (*See*

R. 416.)  Finally, regarding Plaintiff's vocational capacities and limitations, Liane

opined:

> [Plaintiff]'s mental capacity to understand, remember and follow directions
> is good.  I believe that her capacity to sustain attention and concentration is
> fair.  I believe that her ability to carry out work like tasks with reasonable
> persistence and pace is good as long as she remains drug free.  I believe that
> her ability to respond appropriately to brief and superficial contact with
> coworkers and supervisors is fair.  I believe that her ability to tolerate stress
> and pressure typically found in the entry-level workplace is fair to possibly
> poor at times.

(R. 417.)  Regarding Dr. Liane's opinions, the ALJ stated: "These opinions are consistent

with the record and are given weight because the claimant had mostly normal mental

status examinations and remained active; her main issues were self-reported."  (R. 20.)

As to the February and May 2016 opinions of "nonexamining, non-treating State

agency reviewers," Plaintiff's applications for disability benefits and supplemental

security income were reviewed by Disability Examiners in the Social Security

Administration (SSA).  (*See* R. 72-89, 90-107, 111-129, 130-149.)  These Examiners all

concluded that Plaintiff was not disabled.  (*Id*.)  In the process, they opined that Plaintiff

had mild to moderate limitations in remembering and understanding, concentrating and

persisting, and adapting, and that Plaintiff had no limitations in social interaction.  (*Id*.)

The ALJ stated that these opinions supported his factual findings based on the entire

record that Plaintiff has moderate limitations in the activities of daily living, mild

limitations in social functioning, and moderate limitations in concentration, persistence,

or pace when not considering the claimant's substance abuse.  (R. 22.)

Plaintiff is correct that "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. However, opinions of non-treating sources and sources whose observations were formed relatively remotely in time may still be given weight "insofar as they are supported by evidence in the case record." *Id.*; *see also Betts v. Colvin*, No. CIV. 14-2434 JJK, 2015 WL 2105855, at *28 (D. Minn. May 6, 2015). In fact, an ALJ "must consider and evaluate" a state agency medical consultant's residual functional capacity assessment. SSR 96-6p, 1996 WL 374180 at *4. Furthermore, "[i]n appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources." *Id.* at *3; *see also Smith v. Colvin*, 756 F.3d 621, 626-27 (8th Cir. 2014); *Michel v. Colvin*, 640 F. App'x 585, 593 (8th Cir. 2016) (identifying exceptions to the general rule that an ALJ should credit a treating physician's opinion over other medical opinions); *Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007) (citing *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003)).

Here, the ALJ considered the opinions of Liane and the other SSA sources and found both were consistent with the record and that they supported the ALJ's factual findings as to Plaintiff's vocational limitations. (R. 22.) Accordingly, he assigned weight to the opinions of Liane and concluded that the SSA sources supported his factual findings. After a careful review of the record, the Court concludes that the ALJ's

assignment of weight to Dr. Liane's opinions and citation of the SSA sources' opinions as support were both proper.

In assigning weight to state agency and other sources, the ALJ is permitted to consider "the consistency of the opinion with the record as a whole[.]" SSR 96-6p, 1996 WL 374180 at *2. Here, the ALJ assigned weight to the opinions of Liane after concluding that they were consistent with the record, because Plaintiff "had mostly normal mental status examinations and remained active; her main issues were self-reported." (R. 20.) There are indeed numerous examples in the available record through 2017 of occasions in which Plaintiff's mental limitations were not as extreme as claimed by Plaintiff as part of her present Motion. (*See, e.g.*, R. 432-33, 487-88, 595, 663, 669, 674, 807, 811-12, 841-45, 1185, 1186.) Further, many of Plaintiff's claimed mental health issues were indeed self-reported. (*See, e.g.*, R. 595, 674, 853-55.)

Similarly, the ALJ found that the opinions of the SSA sources as to Plaintiff's limitations were consistent with the record as whole. (R. 22.) Again, the ALJ's statement is accurate, as set forth above there are numerous sources in the record which are consistent with the SSA sources' opinions on the extent of Plaintiff's limitations. Further, some of Plaintiff's own testimony concerning her abilities and limitations, given at the hearing before the ALJ, is consistent with the opinions of Liane and the SSA sources (R. 50, 54, 58, 64.) This also includes her own representations in 2017 (after the last 2016 state agency opinion) that her anxiety and depression were under control with medications (R. 997, 999). *See Hensley v. Colvin*, 829 F.3d 926, 933-34 (8th Cir. 2016)

(quoting *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009)) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").

Accordingly, the Court concludes that the ALJ was entitled to consider the opinions of Liane and the SSA sources and to assign them some weight when assessing the extent of Plaintiff's vocational limitations.

**D.      Plaintiff's RFC**

Finally, Plaintiff argues that the ALJ's determination of her RFC is not supported by substantial evidence.  (Dkt. 19 at 25.)  In particular, Plaintiff argues that the ALJ substituted his "lay analysis of the raw medical data" for other steps he could have taken to assess the inconsistencies between NP Little and Therapist Johnsons' opinions and other evidence in the record, such as re-contacting Little or Johnson, obtaining "a review of the record and testimony from a medical expert," or obtaining a second review of Plaintiff's entire file by the SSA.  (*Id*. at 24-25.)  After a careful review of the record, the Court concludes that the ALJ's determination of Plaintiff's RFC is supported by substantial evidence.

"A disability claimant has the burden to establish her RFC."  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'"  *Id*. (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'"  *Id*. (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)).  However, "**there is no**

**requirement that an RFC finding be supported by a specific medical opinion**."

*Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (emphasis added) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)). Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527).

Here, the ALJ cited numerous medical sources from the record that supported his conclusion that Plaintiff had no severe medically determinable physical impairment. (*See* R. 13-14.) Particularly relevant to Plaintiff's arguments are those records, including objective testing, which support the conclusion that Plaintiff's seizure-like episodes can be controlled volitionally and are non-epileptic. (*See, e.g.*, R. 442, 448, 472, 478, 512, 565, 907, 935, 943, 946, 951-53, 1088.)

Similarly, the ALJ cited numerous medical and other sources from the record that supported his findings regarding Plaintiff's non-exertional limitations related to her mental impairments, including that Plaintiff had only moderate limitations in understanding, remembering, or applying information; in interacting with others; in concentrating, persisting, or maintaining pace; and in adapting or managing herself. (*See* R. 15-22; *see also supra* Sections 4(a) and (c).) The ALJ's findings are further supported by records demonstrating Plaintiff's interest in resuming employment (R. 1305), her social abilities and engagement (*see, e.g.*, R. 1095, 1305, 1313, 1322), her ability to control her auditory and visual hallucinations (*see, e.g.*, R. 1294), her ability to attend to

cleaning and self-care tasks (*see, e.g.*, R. 1305, 1321), and her ability to manage her anxiety and other mental health symptoms (*see, e.g.*, R. 997, 999, 1095, 1294).

To the extent Plaintiff has cited some evidence in support of her contention that the RFC was incorrect, "substantial evidence to the contrary allowed the ALJ to make an informed decision." *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012). And to the extent Plaintiff argues that the ALJ could have done other things in evaluating inconsistencies between Little and Johnsons' opinions and other evidence in the record, the ALJ was not required to do so. *Hensley*, 829 F.3d at 932. As such, the Court finds that the ALJ's determination of Plaintiff's RFC was supported by substantial evidence.

## V. ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1. Plaintiff Cassandra S.'s Motion for Summary Judgment (Dkt. 18) is **DENIED**;

2. Defendant Commissioner of Social Security Andrew Saul's Cross Motion for Summary Judgment (Dkt. 21) is **GRANTED**; and

3. This case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: September 24, 2019             *s/Elizabeth Cowan Wright*
                                      ELIZABETH COWAN WRIGHT
                                      United States Magistrate Judge